HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JUDY GRIFFITH PAPINEAU,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>HANNAH HEILMAN; and THE CITY OF TACOMA,<br><br>　　　　　　Defendants. | CASE NO. C12-5256 RBL<br><br>ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br>[DKT. #56] |

THIS MATTER is before the Court on Defendants' Motion for Summary Judgment [Dkt. #56]. On June 15, 2011, Tacoma Police Officer Hannah Heilman pulled Brooks Papineau over on suspicion of driving while intoxicated. As she contacted State Troopers, Papineau exited his truck holding a dark object. Heilman claims she thought the object was a gun and that Papineau was trying to kill her. She shot him three times. Papineau was found with his wallet in his hand. He had a gun in his possession, but it was in his truck. Papineau died shortly after the shooting.

Brooks's wife, Judy, represents his estate[1]. She sued Heilman and the City of Tacoma for violating Brooks's Fourth Amendment rights. The Defendants ask the Court to determine as a

---

[1] For clarity and ease of reference, this Order references the plaintiff as "Papineau," unless the context requires further differentiation.

ORDER - 1

matter of law that (1) Heilman used reasonable force, (2) Heilman is entitled to qualified immunity, (3) the City did not ratify Heilman's actions, and (4) Judy cannot receive punitive damages.

## I. FACTS

On June 15, 2011, Heilman was headed home from her shift with the Tacoma Police. At approximately 1:45 am, she stopped Papineau on suspicion of driving while intoxicated. She contacted a state trooper to process his arrest. While Heilman waited for the trooper, Papineau exited his truck holding a dark object. Heilman claims she thought the object was a handgun because she saw Papineau pick up a Luger[2] just before he exited his truck. Heilman may have also claimed that Papineau shot at her, though she denies saying this. It is undisputed that Heilman shot at Papineau several times and that she hit him three times. He bled profusely.

Papineau was found with only his wallet in his hands. He was a few feet from the driver side door, near his truck bed. The door was open. A Norinco handgun[3] was on the driver seat[4]. Papineau and his truck bed were covered in blood, but his gun and truck interior were completely clean. Papineau was taken to the hospital, but died just after arrival. The angles of two of his wounds showed that he was facing to the left when was shot (as someone would be while stepping out of a driver side door). His BAC was .24 and he had cannabinoids in his system.

In her report and her subsequent depositions, Heilman claims she definitely saw Papineau pick up his gun, but does not know if he was still holding it when he exited his truck. She also

---

[2] Heilman described the barrel as being approximately 5-6 inches long and very narrow.

[3] Papineau's Norinco had a square slide, which does not resemble a Luger's long, narrow, exposed barrel.

[4] Deputy William Burks admits he picked up and inspected the gun immediately after arriving at the scene, before any pictures showing the gun's location were taken. He claims he put the gun back exactly where he found it.

does not know if Papineau shot at her. She claims that Papineau must have either put his gun down as he exited his truck or put it back in his truck after he was shot.

The facts outlined in Pierce County Detective Mark Merod's subsequent application for a warrant to search Papineau's truck were dramatically different than the facts described by the officer on the scene. That application claimed that Papineau fired several shots at Heilman, and that his gun was found on the ground next to him, rather than on the driver's seat. Merod claims he got this information from Detective Tiffany, who in turn claims he got it from Heilman. In an email to the local press, Pierce County Public Information Officer Ed Troyer also claimed that Papineau shot at Heilman. Heilman has not explained why the facts in Merod's application and Troyer's email vary dramatically from the facts in her report and depositions.

Judy Papineau offers another theory. She admits that Brooks had a gun and that he always kept it hidden on the passenger seat. She alleges that Brooks did not touch his gun at any point during his encounter with Heilman. Instead, Brooks exited his truck holding only his wallet when Heilman shot him without warning. She insists that Heilman or another officer must have searched her husband's truck after the shooting, found his gun, and then placed it on the driver's seat to hide the fact that Heilman shot him without probable cause.

Tacoma Police Chief Richard McCrea reviewed the case and determined that Heilman's actions were reasonable and within departmental policy.

Judy Papineau sued Heilman and the City for unreasonably seizing Brooks in violation of his Fourth Amendment rights[5]. Heilman and the City ask the Court to determine as a matter of law that (1) Heilman had just cause to use deadly force because Papineau either tried to kill her or gave her reason to believe he was trying to kill her, (2) Heilman is entitled to qualified

---

[5] She also sued Heilman and the City for violating Brooks's Fourteenth Amendment rights and depriving her of his companionship, but she conceded that she lacks evidence to pursue those claims. They are therefore DISMISSED.

immunity because she must have reasonably believed deadly force was warranted, (3) the City did not ratify Heilman's actions, and (4) Papineau is not entitled to punitive damages.

## II.   DISCUSSION

**A.   Summary Judgment Standard.**

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact which would preclude summary judgment as a matter of law. Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to present, by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Factual disputes whose resolution would not affect the suit's outcome are irrelevant to the consideration of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In other words, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable [fact finder] could return a [decision] in its favor." *Triton Energy*, 68 F.3d at 1220.

**B.   The Court cannot determine as a matter of law that Heilman did not violate Papineau's Fourth Amendment rights.**

A claim that deadly force was excessive is analyzed under the Fourth Amendment's reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). An officer may use deadly force if there is "probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Long v. City and County of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007) (citations and internal quotation marks omitted). Determining

whether an officer had probable cause requires considering the circumstances from the officer's perspective at the time of the incident. *Id*.

Judy claims Heilman used deadly force on Brooks without probable cause. Heilman claims she had probable cause because Brooks either threatened her life or caused her to reasonably believe he threatened her life.

Heilman first argues that Papineau threatened her life by getting out of his truck holding a gun, but the evidence does not support this claim; Papineau died with only a wallet in his hand. His gun was inside his truck on the driver's seat. Heilman does not explain how the gun got back in the truck after Papineau died. Further, Papineau bled all over the side of his truck, but his gun and truck interior were clean, even though the door was open. These facts indicate that Papineau was not near the door when he was shot; it is unlikely that he could or would have put his gun on the seat after being shot. And if he had been holding his gun, it is likely there would have been blood on it. The only evidence that Papineau was holding a gun is Heilman's own testimony, and even she admits she "can't say with absolute certainty" whether Papineau was holding a gun, or whether he shot at her. This uncertainty, and the other evidence, present an issue of material fact regarding whether Papineau was holding his gun. A jury could easily determine that Heilman was simply wrong about what Papineau had in his hand. The Court cannot determine as a matter of law that Papineau posed a serious threat to Heilman's life.

Heilman also argues that Papineau caused her to reasonably believe he was threatening her life by picking up his gun just before he exited his truck holding a dark object. She claims her belief was reasonable even if he put his gun back down before exiting his truck. Papineau picking up, then putting down his gun could explain how it moved from his passenger seat to his driver seat, but seeing him pick up a gun would not automatically justify the shooting. Further,

Heilman's statements are inaccurate and inconsistent.  She claims Papineau picked up a Luger with a long, narrow, exposed barrel, but his Norinco gun had none of those qualities.  Also, while her current account is consistent with her report and her depositions, it differs greatly from the other officers' accounts.  Detective Merod's warrant application said Papineau fired at Heilman and that his gun was found on the ground next to him.  He claimed he heard that story from Detective Tiffany, who in turn heard it from Heilman.  Officer Troyer also reported that Papineau shot at Heilman.  Heilman has not even tried to explain why the accounts are so different.  There are multiple factual disputes regarding whether Heilman's belief was reasonable.  The Court cannot rule as a matter of law that Heilman reasonably believed Papineau threatened her life.

    **C.**    **The Court cannot determine as a matter of law that Heilman is entitled to qualified immunity.**

Under the qualified immunity doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The doctrine's purpose is to "protect officers from the sometimes 'hazy border' between excessive and acceptable force."  *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)).  A two-part test resolves claims of qualified immunity by determining whether plaintiffs have alleged facts that "make out a violation of a constitutional right," and if so, whether the "right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 553 U.S. 223, 232 (2009).

Qualified immunity protects officials "who act in ways they reasonably believe to be lawful." *Garcia v. County of Merced*, 639 F.3d 1206, 1208 (9th Cir. 2011) (quoting *Anderson*,

483 U.S. at 631). The reasonableness inquiry is objective, evaluating 'whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Huff v. City of Burbank*, 632 F.3d 539, 549 (9th Cir. 2011) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). Even if the officer's decision is constitutionally deficient, qualified immunity shields her from suit if her misapprehension about the law applicable to the circumstances was reasonable. *Brosseau*, 543 U.S. at 198 (2004). Qualified immunity "gives ample room for mistaken judgments" and protects "all but the plainly incompetent." *Hunter v. Bryant*, 502 U.S. 224 (1991).

Heilman claims she is entitled to qualified immunity even if she violated Papineau's rights because the only possible explanation for her actions is that she "reasonably thought the use of deadly force was reasonable under the circumstances[6]." [Dkt. #64 at 9]. However, a reasonable jury could find a different basis for her actions: she panicked. Her deposition is full of fearful statements like "it felt like a coffin being in my car" and "I'm in the fight for my life 'cause I know…I know he's coming to kill me." [Dkt. #61, Ex. 2 at 11].

She also admits she acted very quickly: "His movement as he exited the vehicle with the handgun and my movement as I exited my patrol car were simultaneous. As quickly as I could exit my vehicle, I began firing at him." *Id*. The fact Papineau was shot in the left side may support this version of the facts—that Heilman shot him before he even turned to face her. And Heilman's statements are full of inaccuracy and uncertainty, which could lead a jury to find the incident was caused by a panic induced, unreasonable, incorrect belief that she was "fighting for her life." Determining whether Heilman panicked or acted reasonably is a factual issue, not a

---

[6] Heilman's claim that there is no precedent clearly establishing that it is unreasonable for an officer to use deadly force in response to a suspect exiting his vehicle and pointing a gun relies on her own version of the facts. Viewed in the light most favorable to Papineau, the evidence does not support the claim that he had a gun when he exited the vehicle.

legal issue.  The Court cannot determine as a matter of law that Heilman is entitled to qualified immunity.

### D. The Court cannot determine as a matter of law that the City is not liable for Heilman's actions.

A municipality "may be held liable for a constitutional violation if a final policymaker ratifies a subordinate's actions." *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004) (citation omitted).  The policymaker "must have knowledge of the constitutional violation and actually approve of it." *Id.*; *see also Haugen v. Brosseau*, 351 F.3d 372, 393 (9th Cir. 2003), overruled on other grounds by *Brosseau*, 543 U.S. ("plaintiff must show that the triggering decision of the product of a conscious, affirmative choice to ratify the conduct in question").  But, "mere failure to overrule a subordinate's actions, without more is insufficient to support a § 1983 claim." *Id*.

Judy argues that the City is liable for Brooks's death because Chief McCrea ratified Heilman's actions when he determined her actions were reasonable and within departmental policy[7].  The City argues that "[b]ecause the Chief's determination cannot and did not cause the application of force, it cannot and did not cause a constitutional deprivation." [Dkt. #64 at 12].  However, while McCrea's determination did not cause Papineau's death, it could be evidence of a preexisting policy.  *Gravelet-Blondin v. Shelton*, 2013 WL 4767182 (9th Cir. 9.6.13).  "A local government may be held liable under §1983 when…an official with final policy-making authority…ratifie[s] a subordinate's unconstitutional decision or action and the basis for it." *Id*. (quoting *Gillette v. Delmore,* 979 F.2d 1342, 1346–47 (9th Cir.1992).  Therefore it is possible that McCrea's after-the-fact approval is evidence that he allows or even encourages his officers

---

[7] She also sued the City for failing to properly train Heilman, but she has conceded that she lacks sufficient evidence to pursue that claim.  It is therefore DISMISSED.

to react to potentially dangers very quickly.  There is also some evidence supporting Papineau's claim that the police tried to cover something up after the shooting.  For example, the warrant was based on the false claim that Papineau shot at Heilman, and it is not clear how Papineau's gun came to be on his driver's seat.  The City's argument has some merit, but dismissing the *Monell* claim at this stage will not streamline the trial in any way.  Determining whether the City had a policy of allowing its officers to overreact, and whether the police tried to hide something after the shooting are factual issues, not legal ones.  The Court cannot determine as a matter of law that the City is not liable for Papineau's death.

### E. The Court cannot determine as a matter of law that Judy Papineau is not entitled to punitive damages.

Defendants argue that Papineau must provide evidence that Heilman was either motivated by evil intent or that she acted with reckless or callous indifference to Brooks's federally protected rights.  There is no evidence that Heilman acted with evil intent, but, there is significant evidence that Heilman panicked and acted recklessly.  The Court cannot determine as a matter of law that Papineau is not entitled to punitive damages at this stage of the case.  The issue can be addressed in the Court's Instructions to the Jury if the evidence at trial does not support such a claim

### III.   CONCLUSION

The Defendants' motion to determine that Heilman's use of deadly force was reasonable is **DENIED.**  The Defendants' motion to determine that Heilman is entitled to qualified immunity is **DENIED.**  The Defendants' motion to determine that the City of Tacoma cannot be

held liable for Papineau's death is **DENIED.**  The Defendants' motion to determine that Papineau is not entitled to punitive damages is **DENIED.**

**IT IS SO ORDERED.**

Dated this 5th day of November, 2013.

                                 *Ronald B. Leighton*
                                 RONALD B. LEIGHTON
                                 UNITED STATES DISTRICT JUDGE